IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 9, 2019

**DEANGELO NORTON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 15-00754       J. Robert Carter, Jr., Judge**

_____

**No. W2018-01420-CCA-R3-PC**

_____

The petitioner, Deangelo Norton, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received effective assistance of counsel at trial. After our review of the record, briefs, and applicable law, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ROBERT W. WEDEMEYER, JJ., joined.

Eric J. Montierth, Memphis, Tennessee, for the appellant, DeAngelo Norton.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Amy Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

On direct appeal, this Court summarized the facts surrounding the petitioner's convictions for rape of a child and aggravated sexual battery, as follows:

The victim, who was seven years old at the time of the offenses, lived in an apartment in Memphis with his parents and younger sister. During 2011 and 2012, the [petitioner], the victim's uncle, occasionally babysat the victim and his sister. On August 23, 2012, the victim's mother

received a disturbing telephone call at work from her mother, so she went home to speak with the victim. She asked the victim, "Ha[s] [the petitioner] ever d[one] anything to you? Ha[s] he ever touched you?" The victim began to cry and appeared nervous. After being reassured by his mother that he would not get in trouble, the victim confirmed that the [petitioner] had touched him inappropriately. In response, she promised the victim he would never see the [petitioner] again.

The victim testified that he felt scared when he told his mother about the sexual abuse and offered this summation of the first occurrence:

> [The petitioner] took me in my room, told me not to tell anyone. He put me on my bed. He stuck his peewee in my butt and . . . [w]e went into the hallway, he put his thing in my mouth and told me not to let anyone else do it to me.

The victim said that the [petitioner] had "touched [him] more than one time on [his] butt" and that the last incident took place shortly before his mother asked him about the abuse.

On August 24, 2012, the day after the victim disclosed the sexual abuse to his mother, she took the victim to Christ Community Health Services where Dr. Elizabeth Elliott treated him and noted the reason for his visit as follows:

> [The victim] is brought in today by his mother due to concern for possible abuse. [The victim] reports that [the petitioner] used to hurt him when the [petitioner] was keeping him and his sister while his mom was at work. He says that the [petitioner] would place his boy part in [the victim's] mouth and also in his butt. He cannot tell me the last time that it happened. Tells me that it happened a lot. He says that the [petitioner] only did it to him and not his sister.

Dr. Elliot then explained her examination of the victim:

> I evaluated [the victim's] face, specifically the eyes and nose and the mouth looking for signs of trauma. Evaluated lungs, heart and abdomen. Also his genital urinary tract, specifically looking at the penis for signs of urinary discharge or any lesions which were not present. Also examined the testicles

and the anus which appeared normal. Looked at his skin for rashes and there were none as well.

Dr. Elliot informed the victim and his mother that there were no obvious physical signs of sexual abuse, but that finding did not mean the abuse did not happen. Due to the victim's allegations, his mother and Dr. Elliot reported the abuse to the Department of Children's Services ("DCS"). The victim's mother also informed Dr. Elliott she would file a police report.

Subsequently, the victim's mother took the victim to the Memphis Child Advocacy Center for an interview on October 23, 2012. The victim was taken into a room where only the forensic interviewer, Teresa Onry, and the victim were present. Law enforcement officers assigned to the case monitored the interview via video from a separate room and telephoned Ms. Onry at the end of the interview with additional questions.

Ms. Onry said that she asked the victim open-ended questions during the interview because children are vulnerable to suggestibility. The victim told Ms. Onry that the [petitioner] occasionally picked him up from school when his mother was at work. One day after school, the [petitioner] put his penis in the victim's mouth while they were in the hallway of the victim's apartment and told the victim not to let anyone else do that. The [petitioner] them took the victim into the victim's room and put his penis in the victim's anus. According to the victim, the [petitioner] did this on more than one occasion, and it "felt bad." The victim eventually reported the abuse to his mother after she asked if the [petitioner] had ever touched him, and she subsequently took him to see a doctor because his "butt kept hurting."

The victim's mother next took him to the Memphis Sexual Assault Resource Center ("MSARC") on October 25, 2012, where he was examined by Judy Pinson, who was accepted by the trial court as an expert in forensic nursing. Ms. Pinson documented the victim's visit as follows:

Seven and a half year old male referred by DCS and brought in by mother who reports that [the victim] told her in August that [the petitioner] touched him and penetrated him anally and forced fellatio. This occurred more than five times. Mother took child to the Christ Community Health Center in August where he was first questioned and examined.

Ms. Pinson said that she did not find any signs of sexual abuse during her examination of the victim. However, physical injuries are not always found in sexual abuse cases, particularly when there is a lapse in time between the date of abuse and the date of treatment.

Dr. Karen Lakin, assistant professor of pediatrics at the University of Tennessee and the medical director of the LeBonheur Cares Program, testified as an expert in child abuse pediatrics. She said that she reviewed the victim's medical records from Christ Community Health Services and from MSARC. Those records indicated that no physical evidence of abuse was found during either visit. However, the absence of a traumatic medical finding on physical examination following a sexual assault is not unexpected. Based on her review of the records, Dr. Lakin said she would not expect the victim's healthcare providers to have found physical signs of abuse. Young children often have a poor grasp of time lapse, and it appears there was a delayed disclosure of the abuse. Moreover, any injuries to the victim's anus would have healed prior to his treatment because the mucosal portion of the anus heals very rapidly.

On cross-examination, Dr. Lakin acknowledged a 2014 study, *Anal Signs of Child Sexual Abuse: A Case-Control Study*, based on the authors' analysis of every eligible child sexual abuse case from 1990 to 2007. Of those children suspected of being sexually abused, seventy-four percent showed one or more signs of anal injury. Dr. Lakin further acknowledged another study from 2013, *Anal Findings in Children With or Without Probable Anal Penetration*, which also showed a significant correlation between suspected juvenile victims of sexual abuse and anal soiling, fissure, and laceration. The key to both studies, however, was the proximity in time of the suspected sexual abuse to the physical examination. Also, there was a risk of bias with both studies, particularly the second, where the reviewers examined photographs of children they knew in advance had been sexually abused. While the studies found that redness and anal fissures might be present in juvenile victims of sexual abuse, neither study indicated that those findings must be present when sexual abuse has occurred.

Testifying on behalf of the [petitioner], Myneisha Mason, the [petitioner's] sister, said that in 2011 and 2012 the [petitioner] lived with their paralyzed mother and took care of her. When Ms. Mason learned of the victim's accusations, she spoke with the [petitioner], who denied any

- 4 -

inappropriate contact. After the allegations had been made, Ms. Mason attended a birthday party for her mother on June 17, 2013. Both the victim and the [petitioner] were at the party, and the victim appeared calm and happy. Ms. Mason acknowledged that she and the victim's mother have a poor relationship.

Warren Norton, the [petitioner's] brother, testified that he was angry, confused, and shocked when he learned about the allegations against the [petitioner]. He said that when the victim saw the [petitioner] at the party on June 17, 2013, the victim ran and jumped into the [petitioner's] arms. Mr. Norton did not know if the [petitioner] had ever babysat the victim.

Michael Hodo, another brother of the [petitioner] testified that in June 2012 the victim's father, who was in jail at the time, called and asked him to stay with the victim's mother and their children during his incarceration. Ms. Hodo then lived with her, the victim, and the victim's sister for approximately six months. During that time period, he was only alone with the children once and did not remember a babysitter coming to the apartment. He was at the apartment when the victim told his mother about the sexual encounters with the [petitioner], but he never talked to the victim about the allegations.

The [petitioner] testified that he dropped out of school in the ninth grade to care for his paralyzed mother. He did not have a vehicle at the time, but his mother's nurse allowed him to borrow her car occasionally. In addition to caring for his ailing mother, in 2011 and 2012, the [petitioner] babysat the victim and his sister. In August 2012, the victim's mother telephoned the [petitioner] and informed him of the victim's accusations. She then asked the [petitioner] if he had ever touched the victim inappropriately. In response, the [petitioner] "cussed her out" and hung up the phone. Following the telephone call, the [petitioner] did not see the victim again until the birthday party for his mother on June 17, 2013. He and the victim played together at the party, and the victim's mother smiled as she watched them play. The [petitioner] denied sexually abusing the victim and stated, "I know for a fact I did not molest [the victim]." According to the [petitioner], the victim's reason for accusing the [petitioner] remains a mystery.

*State v. Deangelo Norton*, No. W2016-02069-CCA-R3-CD, 2017 WL 2817661 at *1-3 (Tenn. Crim. App. June 29, 2017), *perm. app. denied* (Tenn. Sept. 22, 2017).

Following deliberations, the jury found the petitioner guilty of rape of a child and aggravated sexual battery. The trial court merged the convictions, and the petitioner was sentenced to twenty-five years at 100%. *Id.* at 1. After the denial of his direct appeal, the petitioner filed a timely pro se petition for post-conviction relief. The post-conviction court appointed counsel, and the petitioner filed an amended petition for post-conviction relief. Although the petitioner alleged a number of claims in his petition and at the evidentiary hearing, he confines himself to two issues on appeal, arguing trial counsel was ineffective for failing to (1) present a child abuse expert at trial and (2) object to the State's improper closing argument. Accordingly, we will summarize the evidentiary hearing testimony relevant to those claims.

Trial counsel, who represented the petitioner from arraignment through sentencing, testified the majority of the proof against the petitioner came from the victim's testimony and agreed there was no physical proof of sexual abuse. Trial counsel wanted to present a theory to explain why the victim would lie about the allegations. However, if the defense's theory was presented, the trial court would also allow evidence of a "detrimental" telephone call which suggested there were additional accusations against the petitioner. Trial counsel felt this problem "boxed [them] in" and prevented him from presenting a theory explaining why the victim would lie.

Trial counsel described Dr. Karen Lakin, who testified as an expert for the State regarding the lack of physical injuries on the victim, as a "compelling" and "powerful witness." To combat Dr. Lakin's testimony, trial counsel cross-examined her using several scientific studies, including a study which found seventy-four percent of children of suspected anal sexual abuse showed physical signs or damage. However, this line of questioning was not effective because, even when trial counsel believed he was right, "there is no winning an argument with a doctor." Specifically, Dr. Lakin repeatedly told trial counsel he was "misinterpreting" the results of the studies. Trial counsel testified that, in retrospect, he should have presented his own expert to counter Dr. Lakin's testimony. When asked why he did not obtain an expert for the defense, trial counsel stated he did not believe the lack of physical injuries would be a "big[] part of the trial."

On cross-examination, trial counsel agreed he "hammered on" the fact that the victim did not have any physical injuries, mentioning it several times during his closing argument. He also agreed Dr. Lakin did not refute the studies themselves but disputed their methodology. Although he "wish[ed]" he had requested the funds for an expert, at the time, trial counsel "did not think [he] would get one."

Regarding the prosecutor's statement during closing argument, trial counsel testified the prosecutor placed additional emphasis on the word "you" when he quoted the victim's mother who had asked the victim, "Did [the petitioner] ever touch you?" The

emphasis on "you" suggested there were additional accusers. Although trial counsel did not object at trial, he included this issue in the petitioner's motion for new trial. Trial counsel testified he was unsure why he did not object to this statement at trial, but he knew "the process in this particular courtroom" was to overrule objections during closing argument and issue a curative instruction. Trial counsel also testified he did not want to object frequently because it might "annoy" the jury. On cross-examination, trial counsel agreed he may have refrained from objecting to the statement for fear of drawing attention to the suggestion of additional accusers.

The petitioner testified he met with trial counsel "two or three times" prior to trial and agreed he received a copy of his discovery. The petitioner felt trial counsel's representation was ineffective because trial counsel did not "have the proper experience" and had never tried a rape of a child case before. The petitioner also testified he could not recall the prosecutor's closing argument.

After its review of the evidence presented, the post-conviction court denied relief, and this timely appeal followed.

*Analysis*

On appeal, the petitioner argues trial counsel was ineffective for failing to present a child abuse expert at trial and failing to object to the prosecutor's improper statement during closing argument. The State contends the post-conviction court correctly denied the petition as the petitioner failed to meet his burden. Following our review of the record and submissions of the parties, we affirm the judgment of the post-conviction court.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo,* affording a presumption of correctness only to the post-conviction court's findings of fact. *Id.*; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id.* Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.*; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Initially, we note the statement of facts section of the petitioner's brief fails to comply with Tennessee Rule of Appellate Procedure 27(a)(6), which requires "[a] statement of facts, setting forth the facts relevant to the issues presented for review with appropriate references to the record." Here, the petitioner's statement of facts does not include any references to the record. Furthermore, the petitioner's brief also fails to

comply with Tennessee Rule of Appellate Procedure 27(a)(7)(A), which requires an argument section setting forth "the contentions of the appellant with respect to the issues presented, and the reasons therefore, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record[.]" The petitioner's argument does not include any references to the record, and the petitioner's citations to authority are sparse at best. "[I]t is not the duty of this [C]ourt to scour the record in search of the facts supporting a defendant's argument." *State v. Sharod Winford Moore*, No. M2015-00663-CCA-R3-CD, 2016 WL 3610438 at *8 (Tenn. Crim. App. June 28, 2016), *perm. app. denied* (Tenn. Nov. 17, 2016). Failure to comply with these basics rules constitutes a waiver of the petitioner's issues. Tenn. Ct. Crim. App. R. 10 ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Waiver notwithstanding, we will consider the petitioner's arguments on their merits.

## I.      Failure to Present Expert Witness

The petitioner argues trial counsel was ineffective for failing to present a child abuse expert to counter Dr. Lakin's testimony. The petitioner contends Dr. Lakin's testimony carried "significant weight" with the jury, and a defense expert was needed to counter her testimony. The State contends the petitioner failed to establish prejudice.

At the evidentiary hearing, trial counsel described Dr. Lakin's testimony as "extensive," "credible," and "powerful." Because he did not believe the trial court would grant him the funds for a defense expert, trial counsel decided to cross-examine Dr. Lakin using several studies which found a high correlation between anal sexual abuse and physical injuries. However, Dr. Lakin testified trial counsel was "misinterpreting" the findings of the studies, and trial counsel testified he "lost control" of the cross-examination because "there is no winning an argument with a doctor." He agreed it would have been helpful to have a child abuse expert for the defense who could rebut Dr. Lakin's testimony and, in hindsight, would request the funds from the trial court.

Although trial counsel agreed he should have requested the funds for a defense expert, the petitioner failed to present a child abuse expert at the evidentiary hearing. "To succeed on a claim of ineffective assistance of counsel for failure to call a witness at trial, a post-conviction petitioner should present that witness at the post-conviction hearing." *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008) (citing *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)). "As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." *Id.* Because the petitioner failed to call an expert on sexual abuse injuries at

- 9 -

the post-conviction hearing, he cannot meet his burden. *Id.* The petitioner is not entitled to relief on this issue.

## II.     Failure to Object to Closing Argument

The petitioner also argues trial counsel was ineffective for failing to object to an improper statement by the prosecutor during closing argument. Specifically, the petitioner contends the prosecutor used improper inflection when quoting the victim's mother. The State contends trial counsel made a tactical decision not to object.

"Closing arguments serve to sharpen and to clarify the issues that must be resolved in a criminal case" and enable "the opposing lawyers to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." *State v. Hawkins*. 519 S.W.3d 1, 47 (Tenn. 2017) (citations and quotations omitted). Because counsel in criminal cases are "'expected to be zealous advocates,'" they are afforded "'great latitude in both the style and the substance of their arguments.'" *Id.* (quoting *State v. Banks*, 271 S.W.3d 90, 130-31 (Tenn. 2008)). Prosecutors, however, "must not lose sight of their duty to seek justice impartially and their obligation 'to see to it that the defendant receives a fair trial.'" *Id.* at 47-48 (quoting *Banks*, 271 S.W.3d at 131). Accordingly, a "prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." *Banks*, 271 S.W.3d at 131 (citations omitted). "[P]rosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence, or make derogatory remarks or appeal to the jurors' prejudices." *Id.* (citations omitted).

There are five generally recognized areas of prosecutorial misconduct that can occur during closing arguments:

1.     It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

2.     It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

3.     The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

- 10 -

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on evidence, by injecting issues broader than guilt or innocence of the accused under the controlling law.

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

*State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (internal citations omitted).

Several times during closing argument, the prosecutor quoted a conversation between the victim and his mother where, after receiving a "disturbing" telephone call, the victim's mother asked the victim, "Did [the petitioner] ever touch you?" However, the petitioner contends the prosecutor placed additional emphasis on the word "you" which suggested there were additional accusers.

At the post-conviction hearing, trial counsel testified he argued the statement was improper in the petitioner's motion for new trial. However, trial counsel acknowledged he did not lodge a contemporaneous objection. Although he could not recall why he did not object to the statement, trial counsel testified objections during closing argument are usually overruled in "this particular courtroom," and he did not want the jury to get "annoyed at [him]." On cross-examination, trial counsel testified he sometimes chooses not to object during closing argument to avoid drawing attention to certain points, and he agreed this "probably" came into play during his decision not to object to the prosecutor's statement in this case. The petitioner was unable to recall what was said during closing arguments.

Initially, we note, as previously discussed, the petitioner failed to make any references to the record in his brief. Because the prosecutor repeated the quote from the victim's mother several times during closing argument, we cannot be sure which instance the petitioner takes issue with on appeal. Furthermore, because we have a cold record before us, we are unable to discern nuances of tone, inflection, or body language. Therefore, despite trial counsel's testimony, we find the petitioner has failed to prove his factual allegations regarding this issue by clear and convincing evidence.

Additionally, trial counsel's testimony indicates he made a strategic and informed decision not to object to the prosecutor's statement because he thought the objection would be overruled, he did not want to annoy the jury, and he did not want to draw attention to the prosecutor's point. Implicit in the post-conviction court's order denying relief is an accreditation of trial counsel's testimony, and nothing in the record preponderates against the post-conviction court's factual findings. *See Tidwell*, 922

S.W.2d at 500. In addition, the fact that a trial strategy or tactic failed or was detrimental to the defense does not, alone, support a claim for ineffective assistance of counsel. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is given to sound tactical decisions made after adequate preparation for the case. *Id.* The petitioner is not entitled to relief on this issue.

### *Conclusion*

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's judgment denying the petitioner post-conviction relief.

_____
J. ROSS DYER, JUDGE